# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>In the Matter of the Search of Information<br>Associated with One (1) black IPhone, with<br>associated telephone number 720-788-7589,<br>currently in the possession of the Secret<br>Service, Denver Field Division Office, under<br>case number MK-21-0023, and further<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 21-sw-18-MEH |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ____State and____ District of ____Colorado____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Controlled Substances (Cocaine) |
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (Cocaine) |

The application is based on these facts:
- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Ryan Donahue*
_____
*Applicant's signature*

Ryan Donahue, Special Agent, DEA
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: 01/12/2021

City and state: _____

Denver, CO

*Michael E. Hegarty*
_____
*Judge's signature*

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

One (1) black IPhone, with associated telephone number 720-788-7589, (hereafter and in Attachment A and Attachment B referred to as the "Device").  The Device is currently locked and no additional identification information can be retrieved from the Device. The Device is currently in the possession of the Secret Service, Denver Field Division Office, under case number MK-21-0023, Exhibit N-19, SSEE S001267453, and has been in Secret Service's custody since December 7, 2020, when it was transferred to them from DEA.

**ATTACHMENT B**

**<u>DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED</u>**

For the Device listed and described in **Attachment A**, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances, to wit, cocaine) and 21 U.S.C. § 846 (attempt and conspiracy) (the "Subject Offenses"):

1.      Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Subject Offenses.

2.   All records on the Device described in **Attachment A** that relate to violations of the Subject Offenses and involve QUINTANA-LEDEZMA, and other co-conspirators, on or about or before October 10, 2020, including:

      a.  Lists of customers and related identifying information;

      b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.  any information recording QUINTANA-LEDEZMA's, and/or other co-conspirators' schedule or travel on or about or before October 10, 2020 to November 30, 2020;

      e.  all bank records, checks, credit card bills, account information, and other financial records.

3.      Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device or by other means for the purpose of committing violations of Subject Offenses.

4.      Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Subject Offenses.

5.      Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of Subject Offenses.

6.      Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

pertaining to violations of Subject Offenses or that show who used, owned, possessed, or controlled the Device.

7.      Any and all information, documents, records, photos, videos, audio recordings, or correspondence, in any format or medium, pertaining to use or ownership of the Device, or that aid in the identification of persons involved in violations of Subject Offenses.

8.      Credit card information, bills, and payment records pertaining to violations of Subject Offenses.

9.      Information about usernames or any online accounts or email addresses.

10.     Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Subject Offenses.

11.     Evidence of who used, owned, or controlled the Device to commit or facilitate the commission of the Subject Offenses, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, audio recordings, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

12.     Evidence of software that may allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the Device, and evidence of the lack of such malicious software.

13.     Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence.

14.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device.

15.     Evidence of how and when the Device was used or accessed to determine the chronological context of access, use, and events relating to crime under investigation and to the user;

16.     The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device.

17.     Passwords, encryption keys, and other access devices that may be necessary to access the Device.

18.     Contextual information necessary to understand the evidence described in this attachment.

2

<u>DEFINITIONS:</u>

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, RYAN P. DONAHUE, a Special Agent with the Drug Enforcement Administration, being duly sworn according to law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

### INTRODUCTION

1.     This affidavit is submitted in support of an application under Fed. R. Crim. P. 41 for a search warrant authorizing the examination of property – an electronic device, identified in **Attachment A** as the "Device" – which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in **Attachment B.**  As set forth herein, there is probable cause to believe that a forensic examination of the Device for the purpose of identifying electronically stored data will reveal evidence, fruits, and/or instrumentalities of violations of federal drug trafficking laws, including, but not limited to, 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances, to wit, cocaine) and 18 U.S.C. § 924 (c) possession of a firearm in furtherance of a drug trafficking offense committed by GABRIEL IVAN QUINTANA-LEDEZMA, and other co-conspirators on or about or before November 30, 2020 (the "Subject Offenses").

### AGENT BACKGROUND

2.     Your Affiant is a Special Agent with the Drug Enforcement Administration ("DEA"). As a Special Agent with DEA I am authorized, pursuant to 21 U.S.C. § 878, to conduct investigations, to execute search warrants, and to make arrests for any offense against the United States.  I am a "Federal Law Enforcement Officer" within the meaning of FED.R.CRIM.P. 41(a)(2)(C).

3.     I have been a special agent with the DEA since July 2016.  Before that, I worked from November 2012 to March 2016 as a Senior Officer Specialist with the Federal Bureau of Prisons. During my career, I have participated in numerous drug trafficking investigations during the course of which I have (a) conducted electronic and physical surveillance; (b) debriefed and managed witnesses, cooperators and confidential sources of information who have been involved in drug trafficking and money laundering; (c) monitored wiretapped conversations of individuals committing drug trafficking and money laundering schemes and reviewed line sheets prepared by wiretap monitors; (d) worked in an undercover capacity to gather information about drug trafficking and money laundering; (e) executed search warrants at locations where records and evidence of drug trafficking and money laundering have been found; (f) and reviewed and analyzed organization records, including telephone records, bank records, records kept and maintained by drug traffickers, and property records. My experience is not limited to drug investigations. I also have extensive experience participating in complex investigations into violent street gangs.

4.     I have had experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. Your affiant also has experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such

individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

5.      I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

a.      That a significant percentage of heroin, methamphetamine, and cocaine imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States, and is then transported to various cities throughout the United States for retail distribution.  Furthermore, I know that the importation, transportation, and distribution of heroin, methamphetamine, and cocaine are controlled by a number of well-organized and sophisticated drug trafficking organizations.  I also know that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of distribution in the United States back to Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

b.      That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of drugs, money, and/or other drug related assets are stored. Therefore, one or more locations are often used to store lesser amounts of drugs, money, and/or drug related assets, and additional locations are used to meet customers.

c.      That persons involved in large scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities.

d.      The members of these organizations routinely utilize communication facilities including cellular telephones, satellite telephones, encryption capable UHF transceivers/two-way radios, facsimile machines, electronic mail, and text messaging to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection.  Based on training and experience, I know that narcotics traffickers commonly use prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change these devices frequently to avoid detection by law enforcement officials.

e.  That drug dealers use telephones, portable cellular telephones, pagers, and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

f.  That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, pagers, computers, and external hard drives.  I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such documents and devices, in order to maintain a record of accounts, income, expenditures, assets, and drug-related debts.

g.  I know, based on training and experience, as well as from information relayed to me during the course of my official duties, that narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement.  For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone.  Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.  Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

h.  That drug traffickers have maintained at their locations, including the residences where they live, in their vehicles, and in off-site "stash" locations: money, ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed and that drug traffickers sometimes store drugs, their proceeds, and documents relating to drug activities at storage facilities in an effort to thwart law enforcement efforts to find them.

i.  That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, traveler's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes.

j.  That drug traffickers often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement agencies; and

3

that, even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase and/or control of those assets while continuing to use those assets and exercise dominion and control over them.

k.   That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles.

l.   That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers often maintain these photographs at their premises, within vehicles, or as stored electronic images.

m.   That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations.

n.   That drug dealers commonly have in their possession, that is on their persons, at their residence and/or at their stash houses and in their automobiles, firearms, including: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons that are used to protect and secure the drug trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records. Courts have recognized that firearms and ammunition are a tool of the drug trafficking trade; that drug traffickers utilize firearms to protect themselves from rip-offs or from their drug related items being stolen and/or seized by law enforcement.

o.   There are many reasons why drug traffickers maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer related

4

evidence. However, that evidence may still be retrievable by a trained forensic computer expert.

p. Drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

q. It is common for drug traffickers to conceal contraband, proceeds of drug sales and transactions in secure locations within their residence, including "stash houses," in vehicles, or locations other than their primary residence for ready access and to conceal those items from law enforcement authorities.

r. Drug traffickers keep paraphernalia for manufacturing, packaging, weighing, and distributing controlled substances; that these paraphernalia include, but are not limited to, scales, plastic bags, aluminum foil, paper bindles, zip-lock bags, and other containers used to package and store controlled substances.

6.     The information contained within this affidavit is based on my training and experience, my personal knowledge, observations, and experience, including information of which I am personally aware by virtue of my participation in this investigation, my review of investigative reports, intelligence reports, interviews, and debriefings with participating officers, agents, and cooperating witnesses, and information imparted to me by other law enforcement officers involved in this investigation. I have spoken with other DEA Special Agents and Task Force Officers about this and other similar cases, and I have spoken with narcotics experts regarding methods of operation utilized by subjects who distribute, manufacture, traffic, and/or sell controlled substances. Furthermore, I receive training on a daily basis working on drug investigations for DEA in the Denver, Colorado Division Office. I have also spoken with other DEA Special Agents, Task Force Officers, and Intelligence Analysts regarding the technological devices, tools, and methods used by subjects that traffic and distribute controlled substances.

7.     This affidavit is submitted for the limited purpose of securing a search warrant.  As such, I have not included each and every fact known to me or other law enforcement officers concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities related to the Subject Offenses, described in **Attachment B**, are located in the place described in **Attachment A**.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.     The property to be searched is one (1) black IPhone, with associated telephone number 720-788-7589, (hereafter and in **Attachment A** and **Attachment B** referred to as the "Device").  The Device is currently locked and no additional identification information can be retrieved from the Device. The Device is currently in the possession of the Secret Service, Denver

Field Division Office, under case number MK-21-0023, Exhibit N-19, SSEE S001267453, and has been in Secret Service's custody since December 7, 2020.

9.      Your Affiant believes there is probable cause to believe that the Device is or contains evidence, fruits, and instrumentalities of violations of the Subject Offenses. The applied for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in **Attachment B.**

## TECHNICAL TERMS

10.      Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   <u>Wireless telephone</u>:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.   <u>Removable Storage Media</u>: A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters. Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD drive. These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages. "Computers" or "digital storage media" or "digital storage devices" or "removable storage media" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard

disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

c.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

d.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another

7

location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

11.    Based on my training, experience, and research, I know that the Device may have capabilities that allow it to serve as a wireless telephone, digital camera, PDA, tablet, portable media player, and may be a device capable of recording GPS information, connecting to the internet, and connecting to removable storage media.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

12.    Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

13.    Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

14.    There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have

been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

15.  *Forensic evidence.*  As further described in **Attachment B,** this application seeks permission to locate not only electronically stored information on the Device that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of the use, who used the Device, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of other devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be

recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  Based on training and experience, your Affiant anticipates that an electronic device, such as the Device, used to commit a crime of the type described herein may contain: Phone Call logs & Text Messages with other members of the conspiracy, Photographs of evidence, Map Searches and location history, financial transactions detailing expenses undertaken in furtherance of the conspiracy, and other evidence related to acts undertaken in furtherance of the conspiracy, as well as evidence demonstrating the identities and roles of the co-conspirators.

g.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

10

h.  A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

16.     _Need to review evidence over time and to maintain entirety of evidence._  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in **Attachment B** in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.

17.     Your affiant has also learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in **Attachment B**.  In order to obtain the full picture and meaning of the data from the information sought in **Attachment A** and **Attachment B** of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all

11

evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

18.    _Nature of examination._    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

19.    _Manner of execution._   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## INVESTIGATION AND PROBABLE CAUSE

20.    The Device is currently in the lawful possession of the DEA, who then transferred the Device to Secret Service at the Denver Field Division Office for safekeeping and processing following issuance of a search warrant.  The Device came into DEA's possession when it was located on QUINTANA-LEDEZMA's person pursuant to search incident to arrest on November 30, 2020, as described in greater detail herein.  The Device is believed to belong to QUINTANA-LEDEZMA, because he claimed ownership of it and because he also provided investigators with the assigned telephone 720-788-7589, which is the same telephone number that was in telephone contact with the CS, as discussed herein, prior to the date of QUINTANA-LEDEZMA's arrest.

21.    The Device is currently in storage at the Secret Service Denver Field Division Office, under case number MK-21-0023, Exhibit N-19, SSEE S001267453 and has been in Secret Services' custody since it was transferred by DEA on December 7, 2020.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## I.    Background of Investigation and Communications Regarding Sales of Cocaine

22.    The United States of America, including the DEA and other law enforcement agencies, are currently conducting a criminal investigation of suspected cocaine trafficking and distribution activities of GABRIEL IVAN QUINTANA-LEDEZMA in the Denver, Colorado area.

23.    Since October 10, 2020, a DEA Confidential Source, hereafter referred to as the "CS" has been in telephone communication with a cocaine source of supply (SOS) for the purpose of discussing the sale and purchase of kilogram amounts of cocaine.

24.     On November 27, 2020, the SOS called the CS and informed him/her that the SOS wanted to introduce the CS to an associate (worker) (later identified as QUINTANA-LEDEZMA) that was in possession of kilogram amounts of cocaine and heroin.

25.     On November 28, 2020, at approximately 2:30 p.m., the CS met with the SOS's associate, later identified as Gabriel Ivan QUINTANA-LEDEZMA (YOB: 2000), in the parking lot of the El Tradicional Mexican Restaurant & Cantina located at 2319 8th Avenue, Greeley, Colorado, in order to discuss a multi-kilogram cocaine transaction. The CS advised investigators that QUINTANA-LEDEZMA drove a 2015 Silver Dodge Challenger to the meeting and provided your Affiant with Colorado Registration: AFG-K42 for the vehicle.

26.     During the brief meeting, QUINTANA-LEDEZMA offered several times to take the CS to the stash house in the area of Commerce City, Colorado, where the kilograms of cocaine were being stored so the CS could inspect it. The CS declined the offer and stated he/she did not have time on that particular day. QUINTANA-LEDEZMA stated that he was willing to sell the CS three kilograms of cocaine for $36,000 per kilogram. The CS stated that QUINTANA-LEDEZMA and the CS also discussed the possibility of "fronting" a kilogram.

27.     Before the meeting concluded, the CS was provided with a telephone number by QUINTANA-LEDEZMA: 720-788-7589. The CS asked QUINTANA-LEDEZMA what he/she should save him in his phone as and QUINTANA-LEDEZMA stated "Guerito Cuados." In my training and experience, I know that this roughly translates from Spanish to "white squares," which is a street term to describe "kilograms of cocaine."

28.     A subsequent telephone subscriber request was conducted for telephone number: 720-788-7589. The subscriber request revealed the telephone number is a Verizon Postpaid Account. The telephone subscriber information revealed the telephone number is subscribed to "Hector LEDEZMA" at the address of 822 S. 16th Court, Brighton, Colorado 80601.

29.     On November 29, 2020, the CS informed your Affiant that he/she had received a large number of telephone calls from QUINTANA-LEDEZMA at telephone number: 720-788-7589. The CS informed your Affiant that QUINTANA-LEDEZMA was becoming pushy and appeared desperate to conduct a cocaine transaction with the CS and insisted on showing the CS where the cocaine stash house was located in the areas of Commerce City, Colorado, in order to let the CS inspect the product. The CS told QUINTANA-LEDEZMA that he/she was working (legitimate job) and was busy and would call him back later. Your Affiant believes QUINTANA-LEDEZMA thought the CS was referencing conducting cocaine-related business when the CS said he/she was "working," as QUINTANA-LEDEZMA relayed "oh don't worry you can do business with us". On this day, the CS also received an incoming text message which included a video from QUINTANA-LEDEZMA at telephone number: 720-788-7589, which depicted a kilogram of cocaine with what your Affiant believes was a "55" stamp on the center of the kilogram. The kilogram of cocaine appeared to have been wrapped in tin foil and with black electrical tape over it.

## II.        November 30, 2020 Meeting and Seizure of Kilogram of Cocaine and Firearm

30.        On November 30, 2020, an undercover detective working with the Thornton Police Department (hereafter referred to as "UC") was included in the investigation with the CS to travel with the CS to a future cocaine transaction to be conducted with QUINTANA-LEDEZMA.

31.        On November 30, 2020, the CS spoke with the QUINTANA-LEDEZMA on telephone number: 720-788-7589, multiple times to arrange a meeting for the evening of November 30, 2020. QUINTANA-LEDEZMA agreed to provide a free sample of the cocaine to the CS and UC, in order to assist in facilitating a multi-kilogram cocaine transaction. The CS and UC subsequently agreed to meet QUINTANA-LEDEZMA at a McDonalds restaurant located at 10400 Belle Creek Boulevard, Commerce City, Colorado, at approximately 6:00 p.m.

32.        Prior to the meeting, the UC searched the UC vehicle to be used by the CS and UC during the meeting, with negative results for contraband.  Your Affiant also conducted a search of the CS's person, as witnessed by ICE ERO Ramirez, which was also negative for any contraband.

33.        At approximately 6:00 p.m., surveillance units observed QUINTANA-LEDEZMA arrive at the location driving a 2015 silver Dodge Challenger, Colorado Registration: AFG-K42. The vehicle parked in the parking lot.  QUINTANA-LEDEZMA then exited the driver's seat and walked to the rear passenger side of the UC vehicle, entered the vehicle, and shut the door. QUINTANA-LEDEZMA then engaged in conversation with the CS and UC, at which point he provided the UC and CS with a clear plastic baggie containing a white powdery substance consistent with cocaine.

34.        During the conversation, the CS, UC, and QUINTANA-LEDEZMA discussed prices and availability of more cocaine. The CS and UC advised QUINTANA-LEDEZMA they would have to go get money for the purchase of more cocaine. QUINTANA-LEDEZMA stated they could come to his residence to pick up and purchase one (1) kilogram of cocaine. After the agreement was made, QUINTANA-LEDEZMA left the location in the 2015 silver Dodge Challenger. The baggy of cocaine provided to the UC and CS was later weighed by investigators, with a weight of approximately 30.8 gross grams. This cocaine was field tested with a NIK field testing kit, which showed presumptive positive for cocaine. The cocaine was subsequently analyzed and tested at the DEA Western regional laboratory. The analysis revealed the sample seized on November 30, 2020, was in fact cocaine and had a net weight of 1.087 grams plus or minus 0.002 gram.

35.        QUINTANA-LEDEZMA was then followed by surveillance units to the residence at 7228 E. 61st Place Commerce City, Colorado. QUINTANA-LEDEZMA parked in front of the house on the street blocking the driveway.  A short time later, QUINTANA-LEDEZMA sent the CS a text message informing the CS of his address. The text message read "7228 e 61st pl[.]" The CS and UC then called QUINTANA-LEDEZMA and advised they would come to the residence to purchase the cocaine.

36.        At approximately 6:52 p.m., the CS received a telephone call from QUINTANA-LEDEZMA at telephone number: 720-788-7589. QUINTANA-LEDEZMA called and asked where they were at and the CS advised QUINTANA-LEDEZMA they were on the way. At

approximately 7:24 p.m., the UC and CS arrived at the residence and parked behind the 2015 silver Dodge Challenger on the street. QUINTANA-LEDEZMA then exited the residence at 7228 E. 61st Place, Commerce City, Colorado, approached the UC vehicle, and asked the CS and UC to conduct the transaction in the basement of the residence.  The CS and UC informed QUINTANA-LEDEZMA that they preferred conducting the deal in the vehicle and asked QUINTANA-LEDEZMA to get into the backseat. QUINTANA-LEDEZMA subsequently entered the rear passenger side of the UC vehicle.

37.     Upon entering the vehicle, QUINTANA-LEDEZMA produced a white grocery bag containing a rectangular shaped object.  QUINTANA-LEDEZMA pulled the white grocery bag out of a zipped up jacket he was wearing. The CS and UC both looked into the bag with the rectangular shaped object, and observed a rectangular object consistent with a video the CS previously received from QUINTANA-LEDEZMA depicting a kilogram of cocaine. The UC and CS further observed that the rectangular object appears to be a white powdery substance consistent with cocaine. The size and shape of the object was also consistent with a kilogram of cocaine.

38.     The UC then placed the kilogram of cocaine on a digital scale he/she had in the vehicle in order to determine if the kilogram was the appropriate weight. Upon observing the cocaine and inspecting it, the UC provided a predetermined arrest signal to surveillance units. A controlled arrest/buy-bust operation was conducted and QUINTANA-LEDEZMA was arrested by investigators shortly thereafter.

39.     Following the arrest of QUINTANA-LEDEZMA, a loaded Glock 19 semi-automatic handgun was located where he was seated and a kilogram of cocaine was located on top of a digital scale on the center console. The UC later informed your Affiant that as investigators moved to arrest QUINTANA-LEDEZMA, the UC observed QUINTANA-LEDEZMA's hand in his waistband near the firearm in what the UC believed was a possible attempt to pull the firearm out.

40.     The suspected kilogram of cocaine provided by QUINTANA-LEDEZMA in the UC vehicle was later transported to the DEA Denver Field Division Office for processing by your Affiant, weighed and NIK tested. The NIK test was presumptive positive for cocaine, and the substance had a gross weight of approximately 1125.2 grams. The cocaine was subsequently analyzed and tested at the DEA Western regional laboratory. The analysis revealed the kilogram seized on November 30, 2020, was in fact cocaine and had a net weight of 961 grams plus or minus 1 gram.

## III.   Background Post-Arrest Interview of QUINTANA-LEDEZMA

41.     Your Affiant subsequently conducted a post arrest interview with QUINTANA-LEDEZMA in custody at the Commerce City Police Department. QUINTANA-LEDEZMA was advised of his Miranda rights from a DEA 13b (Spanish Advisal of Rights) and agreed to answer questions without an attorney present. During the interview, QUINTANA-LEDEZMA informed investigators that his telephone number was 720-788-7589, which your Affiant notes is the same telephone number the CS used to communicate with QUINTANA-LEDEZMA to negotiate and arrange the sale and purchase of multi-kilogram amounts of cocaine.

42.     QUINTANA-LEDEZMA further admitted to being in the area of 104th Avenue in Commerce City, Colorado, around 6:00 p.m. on November 30, 2020, but was deceptive regarding what he was doing in the area. QUINTANA-LEDEZMA subsequently admitted that he possessed the loaded Glock 19 semi-automatic handgun in the back of the UC vehicle; however, he denied owning the firearm or possessing it in furtherance of a drug trafficking crime, and claimed he just liked firearms and was testing out the handgun to see if he liked it and would potentially purchase it at a later date and time if he did.

43.     QUINTANA-LEDEZMA further claimed he did not know how the kilogram of cocaine got into the UC vehicle; however, stated that the source of the kilogram resided inside the residence, and admitted that he tried to get the CS and UC to come into the residence but only to meet other people.

44.     QUINTANA-LEDEZMA further admitted to meeting the CS on one prior occasion at a Mexican Restaurant in Greeley, Colorado, but would not elaborate why they met there or who introduced them. QUINTANA-LEDEZMA ultimately denied being involved in drug trafficking and informed investigators that the kilogram of cocaine found in the UC vehicle came from and belonged to "Gordo," who resided in the residence.

45.     The Device was located on QUINTANA-LEDEZMA persons pursuant to search incident to arrest on November 30, 2020.  The Device is believed to belong to QUINTANA-LEDEZMA, because he claimed ownership of it and because he also provided investigators with the assigned telephone 720-788-7589, which is the same telephone number that was in telephone contact with the CS establishing the transaction.

## CONCLUSION

46.     Based on the foregoing information, probable cause exists to believe that a forensic examination of the Device, described in **Attachment A**, will reveal electronically stored data described in **Attachment B** constituting evidence, fruits, and instrumentalities of the Subject Offenses committed by QUINTANA-LEDEZMA, and other co-conspirators. Specifically, your Affiant believes that QUINTANA-LEDEZMA and other co-conspirators may have used the Device to discuss, plan, and/or coordinate the planned drug transaction described herein, both on the date of the offense described above, as well as on other dates, and may have also used the Device to communicate with others regarding similar or related offenses.  Contained on the Device may be records of said communications, as well as other information and evidence, set forth in **Attachment B**, that is related to this investigation.

47.     Your Affiant therefore respectfully requests that the attached Search Warrant be issued authorizing the search and seizure of the items described in **Attachment A**, for the evidence listed in **Attachment B**.

I, Ryan P. Donahue, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

*s/Ryan Donahue*
Ryan Donahue, Special Agent
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means before me on this  12th  day of January, 2021.

BY THE COURT:

HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Reviewed and submitted by Assistant United States Attorney Conor A. Flanigan.**

17